**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

NATIONAL IMMIGRATION LAW CENTER

             Plaintiff,

      v.

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY

and

UNITED STATES IMMIGRATION AND
CUSTOMS ENFORCEMENT

             Defendants.

Civil Action No. 1:19-cv-00866 (RC)

**PLAINTIFF'S EXPEDITED RENEWED MOTION FOR PRELIMINARY INJUNCTION**

        Pursuant to Fed. R. Civ. P. 65, Plaintiff National Immigration Law Center ("NILC") respectfully renews its motion and seeks, on an expedited basis, the entry of a preliminary injunction to enjoin the unlawful redactions on documents provided by Defendants Department of Homeland Security ("DHS") and Immigration and Customs Enforcement ("ICE"). Plaintiff seeks the names, ranks and office locations of federal officers from ICE who were physically present during a worksite enforcement operation conducted on April 5, 2018, at Southeastern Provision located at 1617 Helton Road, Bean Station, Tennessee (the "Raid"). Plaintiff seeks this information to preserve *Bivens* claims against the ICE officers as perpetrators of civil rights violations and to increase public awareness of the actions of the federal officers and ICE at the Raid.

        This Court has already granted expedited proceedings here and Plaintiff's first motion for preliminary injunction. (Minute Order Granting Pl.'s Mot. for Prelim. Inj.; Granting

Pl.'s Mot. to Expedite Proceedings, entered Apr. 1, 2019 (the "Minute Order").)  NILC

respectfully requests that the Court order Defendants to produce, on or before April 3, 2019,

copies of the record(s) produced on April 2, 2019 without the names, ranks or office locations

redacted.

   The grounds for this motion are set forth in the accompanying memorandum of

points and authorities.

 Dated: April 2, 2019        Respectfully submitted,


            /s/ Donald P. Salzman
            Donald P. Salzman, DC Bar No. 479775
            1440 New York Avenue, N.W.
            Washington, D.C. 20005
            T: 202-371-7983
            F: 202-661-9063
            E: Donald.Salzman@probonolaw.com

            Eben P. Colby, MA Bar No. 651546,
            Admitted Pro Hac Vice
            500 Boylston Street
            Boston, Massachusetts 02116
            T: 617-573- 4855
            F: 617-305-4855
            E: Eben.colby@probonolaw.com

            Arthur R. Bookout, DE Bar No. 5409,
            Admitted Pro Hac Vice
            One Rodney Square
            920 N. King Street
            Wilmington, Delaware 19801
            T: 302-651-3026
            F: 302-434-3026
            E: Art.bookout@probonolaw.corn

            Jason S. Levin, DE Bar No. 6434,
            Admitted Pro Hac Vice
            One Rodney Square
            920 N. King Street
            Wilmington, Delaware 19801
            T: 302-651-3086
            F: 302-434-3085

E: Jason.levin@probonolaw.com

*Counsel for National Immigration Law Center*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| NATIONAL IMMIGRATION LAW CENTER | |
| Plaintiff, | |
| v. | Civil Action No. 1:19-cv-00866 (RC) |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY | |
| and | |
| UNITED STATES IMMIGRATION AND CUSTOMS ENFORCEMENT | |
| Defendants. | |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S
EXPEDITED RENEWED MOTION FOR PRELIMINARY INJUNCTION**

Plaintiff National Immigration Law Center ("NILC") respectfully submits this memorandum of points and authorities in support of its renewed motion for preliminary injunction.

**PRELIMINARY STATEMENT**

Yesterday, this Court granted Plaintiff's Motion for Preliminary Injunction and ordered Defendants to produce, on or before the close of business today, "at least one record containing all of the information sought by Plaintiff's FOIA request at issue here." (Minute Order.) The Court found that, "but for the government's error," NILC's Freedom of Information Act ("FOIA") request, dated December 7, 2018 (the "Request"), "would have been completed long ago." (*Id.*) The Court also found that NILC had demonstrated a "substantial likelihood of success on the merits" and the required equities, and stated that the public interest favored

granting the injunction because the government already determined that expedited processing was appropriate to fix "the government's error." (*Id.*)  The Court found that NILC had a "very, very strong" claim for irreparable harm (Hr'g Tr. 13:5, April 1, 2019) because, without the names, ranks and office locations of the Immigration and Customs Enforcement ("ICE") officers present on the ground during the immigration raid conducted at Southeastern Provision in Bean Station, Tennessee on April 5, 2018 (the "Raid"), "the individuals Plaintiff represents in Tennessee may lose their ability to pursue *Bivens* claims due to the imminent lapsing of the relevant statute of limitations" (Minute Order).

At 4:35 p.m. today, Defendants produced one ten-page document.  Defendants' counsel represented to NILC's counsel that the document produced today contains the names and ranks of the officers physically present during the Raid (the "Officers").  However, NILC has no way to actually *see* this purported information because Defendants redacted all of it.  Despite the lack of a search for responsive documents and their inability to see any such documents, Defendants argued in opposition to NILC's first injunction motion that the narrow information NILC sought in the Request would "likely be withheld" under Exemptions 6 and/or 7(C) to the FOIA statute.  Not surprisingly, that is exactly what Defendants now claim.  NILC could not address in its briefing on the first injunction motion the Exemption 6 and 7(C) issues because Defendants raised them for the first time in their opposition brief.  NILC addresses them now, and Defendants' arguments fail.

Defendants' arguments fail because, among other things, NILC has provided evidence sufficient to establish to a reasonable person that Officer wrongdoing and misconduct might have occurred.  With this motion, NILC has filed sworn declarations from each of the seven named plaintiffs in the related Tennessee litigation.  Each sworn declaration details what

the individuals subjected to the Raid witnessed and experienced; each separately describes the violations of their Constitutional rights; and each provides corroborating accounts of the others. As a result, the strong public interest in (i) knowing the details of Officer misconduct, (ii) understanding how and why Defendants conducted an immigration raid, including detentions, without proper authority and under the post-hoc cover of an IRS search warrant for financial records, and (iii) knowing whether federal officers can be held accountable when they inflict racially discriminatory pain, humiliation and unlawful arrest on unsuspecting plant workers, convincingly outweighs any privacy interest the Officers may have in their names, ranks and office locations.  The Officers will have a chance to defend their actions in the related Tennessee litigation.  The government should not be allowed to drag its feet and try to run out the clock to give the Officers an additional technical argument.  Accordingly, the Court should order Defendants to unredact the names, ranks and office information for each Officer immediately.

## STATEMENT OF FACTS

### A.     ICE Officers Use An IRS Search Warrant To Execute The Single Largest Immigration Raid In Almost A Decade.

On April 5, 2018, Isabel Zelaya, Geronimo Guerrero, Carolina Romulo Mendoza, Luis Bautista Martinez, Martha Pulido, Catarino Zapote Hernandez, and Maria Del Pilar Gonzales Cruz arrived to work at Southeastern Provision (the "Plant"), which was located outside of Bean Station, Tennessee (a town with a population of approximately 3,100).  (*See* Decl. of Isabel Zelaya in Supp. of Pl's Expedited Renewed Mot. for Prelim. Inj. ("Zelaya Decl.") ¶¶ 3, 5; Decl. of Geronimo Guerrero in Supp. of same ("Guerrero Decl.") ¶¶ 3, 5; Decl. of Carolina Romulo Mendoza in Supp. of same ("Romulo Decl.") ¶¶ 3, 5; Decl. of Luis Bautista Martinez in Supp. of same ("Bautista Decl.") ¶¶ 3, 5; Decl. of Martha Pulido in Supp. of same ("Pulido Decl.") ¶¶ 3, 5; Decl. of Catarino Zapote Hernandez in Supp. of same ("Zapote Decl.")

3

¶¶ 3, 5; Decl. of Maria Del Pilar Gonzalez Cruz in Supp. of same ("Gonzalez Decl.") ¶¶ 3, 5;

Decl. of Melissa S. Keaney in Supp. of Pl.'s Expedited Renewed Mot. for Prelim. Inj. ("Keaney

Decl.") ¶¶ 3-4.)[1]

       Work that day – at least for every Latino Plant worker – did not last long.  In a

coordinated effort with the Tennessee Highway Patrol, dozens of Officers executed a pre-

planned, calculated strike and descended on the Plant at approximately 9:00 a.m. (*See* Zelaya

Decl. ¶ 5; Guerrero Decl ¶ 5; Romulo Decl. ¶ 5; Bautista Decl. ¶ 5; Pulido Decl. ¶ 5; Zapote

Decl. ¶ 5; Gonzalez Decl. ¶¶ 5-6; Keaney Decl. ¶ 5.)  Multiple Officers blocked each exit.

(Zelaya Decl. ¶ 8; Romulo Decl. ¶ 7; Bautista Decl. ¶ 7; Pulido Decl. ¶ 5; Zapote Decl. ¶ 5;

Gonzalez Decl. ¶ 5.)  Numerous armed Officers began shouting and ordering people to put their

hands up.  (Romulo Decl. ¶ 6; Pulido Decl. ¶ 6; Gonzalez Decl. ¶ 5.)  The Officers then pointed

their guns at the Latino workers.  (Zelaya Decl. ¶¶ 7-8; Bautista Decl. ¶ 5; Pulido Decl. ¶ 6;

Gonzalez Decl. ¶ 6.)  Without provocation, a short, white, armed male Officer punched Mr.

Guerrero in the face.  (Guerrero Decl. ¶ 6; Pulido Decl. ¶ 6.)  Mr. Guerrero was then pushed

against the wall by his assailant and another Officer, who was tall and appeared to be of Asian

descent.  (Guerrero Decl. ¶ 7.)  The Officers never identified themselves.  (Guerrero Decl. ¶ 8.)

Another tall, white, male Officer pushed a female worker.  (Pulido Decl. ¶ 6.)  Other Officers

shoved workers to the ground.  (Zelaya Decl. ¶ 8.)  Yet another tall, white, male Officer grabbed

Mr. Bautista by the shirt and forced him outside.  (Bautista Decl. ¶ 6.)

       The Officers began forcing the workers to exit the Plant. (*See* Zelaya Decl. ¶ 13;

Guerrero Decl ¶ 12; Romulo Decl. ¶ 7; Bautista Decl. ¶ 6; Pulido Decl. ¶ 8; Zapote Decl. ¶ 7;

---

[1]   The Zelaya, Guerrero, Romulo, Bautista, Pulido, Zapote and Gonzalez declarations are referred to collectively as the "Tennessee Plaintiffs' Declarations."

Gonzalez Decl. ¶ 7.)  Once outside, the workers could see that the Officers had blocked the only

road leading to the Plant.  (Romulo Decl. ¶ 7; Zapote Decl. ¶ 8.)  A helicopter flew overhead.

(Romulo Decl. ¶ 7; Bautista Decl. ¶ 7.)  The Latino workers were arrested, handcuffed with zip

ties and ordered not to move or utter a word.  (*See* Zelaya Decl. ¶ 12; Guerrero Decl ¶¶ 10-11;

Bautista Decl. ¶ 10; Pulido Decl. ¶¶ 9-10; Zapote Decl. ¶ 8; Gonzalez Decl. ¶ 7.)  When a worker

fell to the ground, an Officer ran over to the worker, placed his foot on the worker's head, and

pointed a gun at the fallen worker while two more Officers handcuffed the worker.  (Bautista

Decl. ¶ 8.)  Mr. Bautista asked one of the Officers if a pregnant co-worker could sit down and

was told to "Shut [his] f—king mouth."  (Bautista Decl. ¶ 11.)

　　　　While being detained outside the Plant for nearly two hours, Mr. Bautista

repeatedly asked the Officers to use the restroom.  (Bautista Decl. ¶ 12.)  He was told, "You

don't have rights here" and was called "Mexican sh-t."  (Bautista Decl. ¶ 12.)  When Mr.

Bautista told the Officers that he urgently needed to use the bathroom, a white, male ICE Officer

grabbed him by the shoulder and took him to an area behind a trailer.  (Bautista Decl. ¶ 13.)

There, in plain sight of other Officers who did nothing to stop him, the Officer held a gun to Mr.

Bautista's head and told him to relieve himself out in the open.  (Bautista Decl. ¶ 13.)

　　　　By contrast, the "white" workers at the Plant were allowed to walk around freely,

were not arrested or handcuffed, and were allowed to smoke.  (*See* Guerrero Decl ¶ 10; Bautista

Decl. ¶ 14; Pulido Decl. ¶ 11.)  None of the Officers interrogated the white Plant workers.

(Pulido Decl. ¶ 11.)

　　　　The Latino Plant workers were transported in waiting vehicles to a National

Guard Armory (the "Armory") in a different town, Russellville, Tennessee, approximately 20

minutes away.  (*See* Zelaya Decl. ¶ 13; Guerrero Decl ¶ 13; Romulo Decl. ¶ 9; Bautista Decl. ¶

14; Pulido Decl. ¶ 12; Zapote Decl. ¶ 8; Gonzalez Decl. ¶ 8; Keaney Decl. ¶ 6.)  In one of the

transport vans, one of the Officers took out his phone and yelled "selfie!" while photographing

himself and the handcuffed workers.  (Bautista Decl. ¶ 15.)  Once the Latino Plant workers

arrived at the Armory, they were stripped of their personal items and interrogated, released from

their zip ties and fingerprinted.  (*See* Zelaya Decl. ¶ 14; Guerrero Decl ¶ 13; Romulo Decl. ¶ 9;

Bautista Decl. ¶ 18; Pulido Decl. ¶ 13; Zapote Decl. ¶¶ 8-9; Gonzalez Decl. ¶ 9.)  Most of the

workers who were arrested were not questioned about their identity, work authorization or

immigration status until after they were detained at the Plant and transported to the Armory.

(*See* Zelaya Decl. ¶ 15; Guerrero Decl ¶ 15; Romulo Decl. ¶ 11; Bautista Decl. ¶ 20; Pulido

Decl. ¶ 14.)  Even if they had been, Mr. Zelaya's experience shows that it would not have

mattered.  While still at the Plant, Mr. Zelaya told one of the Officers that he had legal status and

handed the Officer his Employment Authorization Card.  (Zelaya Decl. ¶ 11.)  The Officer

grabbed the card, told Mr. Zelaya that ICE needed to "investigate" him and wrongfully arrested

him anyway.  (Zelaya Decl. ¶ 12.)

     All of the workers transported to the Armory were held for several hours – many

of the arrested workers were detained for 10 hours or more from the moment the Raid began

until their release.  (*See* Guerrero Decl. ¶ 14 (12 hours); Romulo Decl. ¶ 10 (10 hours); Bautista

Decl. ¶ 19 (12 hours); Pulido Decl. ¶ 15 (14 hours).)

     The basis for this entire military-like operation:  an IRS search warrant for

*financial documents* of the Plant's owner, James Brantley.  (Keaney Decl. ¶ 7 & Ex. N)  The

only items authorized to be seized under the IRS document warrant were, among other things, all

"records, documents and materials … related to the financial activities of James Brantley."

(Keaney Decl. ¶ 8 & Ex. N, Attachment B at 1.)  Without offering a connection to the financial

activities that were the subject of the warrant, the affidavit submitted with the IRS search warrant stated multiple times that the Plant's employees are "Hispanic."  (Keaney Decl. ¶ 9; *see also, e.g.*, Keaney Decl. Ex. O at 9-10.)

As shown in the document produced today by Defendants, the warrant was just a cover for the Raid and Defendants had no intention of sticking to the language of the search warrant.  Page 1 of DHS's "Enforcement Operation Plan" states that the Officers will "[i]nterview/identify illegal employees" at the Plant.  (Keaney Decl. Ex. P at 1.)[2]  The Enforcement Operation Plan is dated March 19, 2018.  (*Id.*)  The affidavit supporting the IRS search warrant for documents was not even executed until April 2, 2018 – *two weeks* after Defendants had the strike plan in place.  (Keaney Decl. Ex. O at 22 & Ex. P at 1.)

The Raid was the single largest worksite enforcement action in almost a decade.  (Keaney Decl. Ex. E at 1.)  The Raid (and subsequent lawsuit) garnered significant public attention.[3]  Of the nearly 100 Latino workers arrested that day (a number that equates to

---

[2]   Pincites to Keaney Declaration Exhibit P refer to the page numbers of the Enforcement Operation Plan attached to Defendants' April 2, 2019 response letter.

[3]   Maria Sacchetti, *ICE raids meatpacking plant in rural Tennessee; 97 immigrants arrested*, Wash. Post (Apr. 6, 2018), https://www.washingtonpost.com/local/immigration/ice-raids-meatpacking-plant-in-rural-tennessee-more-than-95-immigrants-arrested/2018/04/06/4955a79a-39a6-11e8-8fd2-49fe3c675a89_story.html?utm_term=.437102fe03ce; Marc Sallinger & Louis Fernandez, *Families wait for answers after ICE raid in Grainger County*, WBIR (Apr. 6, 2018, 9:00 PM), https://www.wbir.com/article/news/local/families-wait-for-answers-after-ice-raid-in-grainger-county/51-536062125; Lauren Hoar, et al., *Affidavit details alleged worker exploitation, tax fraud at Grainger Co. Plant*, WBIR (Apr. 6, 2018, 9:26 PM), https://www.wbir.com/article/news/crime/affidavit-details-alleged-worker-exploitation-tax-fraud-at-grainger-co-plant/51-535625793; Marshall Stephens, *Large cash withdrawals led federal authorities to Grainger County slaughterhouse*, WATE (Apr. 6, 2018, 11:33 PM), https://www.wate.com/news/local-news/97-detained-at-grainger-co-slaughterhouse-following-ice-raid/1104512258; Robert Moore, *IRS, I.C.E. officials raid Grainger County meat packing plant*, Citizen Tribune (Apr. 6, 2018), https://www.citizentribune.com/news/local/irs-i-c-e-officials-raid-grainger-county-meat-

*(cont'd)*

approximately 3% of the *entire population* of Bean Station, Tennessee), only 11 were charged

with any crime and none were charged with a violent crime.  (Keaney Decl. ¶ 10.)  The next day,

600 children missed school.  (Keaney Decl. ¶ 11.)

## B.   NILC Immediately Submits A FOIA Request; ICE Refuses.

On April 10, 2018, five days after the Raid, NILC sent a FOIA request to ICE

seeking 14 categories of documents in connection with the Raid.  (Keaney Decl. ¶ 12, Ex. A.)

---

*(cont'd from previous page)*
packing/article_214bbe7e-39ba-11e8-b62c-bb1f2d394701.html; Travis Dorman & Jamie
Satterfield, *ICE raids Grainger County meatpacking plant amid charges owners avoided
$2.5M in payroll taxes*, Knox News (Apr. 6, 2018, 5:26 PM),
https://www.knoxnews.com/story/news/crime/2018/04/05/ice-raids-meatpacking-plant-
grainger-county/490673002/; Sara Brown, *97 Arrested in Immigration Raid at TN Beef
Plant*, Ag Web (Apr. 6, 2018, 3:38 PM), https://www.agweb.com/article/97-arrested-in-
immigration-raid-at-tn-beef-plant/; *At least 50 detained in Tennessee immigration raid*,
WKYT (Apr. 6, 2018, 11:12 AM), https://www.wkyt.com/content/news/At-least-50-
detained-in-Tennessee-immigration-raid-478981663.html; Jonathan Blitzer, *An ICE Raid
Has Turned the Lives of Hundreds of Tennessee Kids Upside Down*, New Yorker (Apr. 24,
2018), https://www.newyorker.com/news/dispatch/an-icesmall-raid-has-turned-the-lives-of-
hundreds-of-tennessee-kids-upside-down; Daniella Silva, *Workers detained in massive
Tennessee raid sue ICE officers*, NBC News (Feb. 21, 2019, 3:07 PM),
https://www.nbcnews.com/news/latino/workers-detained-massive-tennessee-raid-sue-ice-
officers-n974116; Matt Lakin, *Bean State ICE raid: Workers sue agents, Trump
administration in immigration roundup*, Knox News (Feb. 22, 2019, 11:33 AM),
https://www.knoxnews.com/story/news/2019/02/21/bean-station-ice-raid-undocumented-
immigrants-sue-agents-roundup-trump-border-wall-illegal/2936489002/; Matt Lakin, *Bean
Station ICE raid: Workers want fast track for lawsuit against Trump admin*, Knox News
(Feb. 27, 2019, 2:21 PM),
https://www.knoxnews.com/story/news/crime/2019/02/27/tennessee-ice-raid-bean-station-
slaughterhouse/2990085002/; Louis C. LaBrecque, *Immigration Raid Violated Latino
Workers' Rights, Lawsuit Says*, Bloomberg Law (Feb. 21, 2019, 3:34 PM),
https://news.bloomberglaw.com/daily-labor-report/immigration-raid-violated-latino-workers-
rights-lawsuit-says; Gillian Edevane, *ICE Agents Accused of Excessive Force, Using Racial
Slurs During Tennessee Slaughterhouse Raid: Lawsuit*, Newsweek (Feb. 24, 2019, 3:49 PM),
https://www.newsweek.com/ice-agents-accused-punching-immigrants-yelling-racial-slurs-
during-1341984; Gabriella Pagán, *Workers detained in Bean Station ICE raid filing suit,
claiming rights violations*, WATE (Feb. 21, 2019, 7:22 PM),
https://www.wate.com/news/local-news/workers-detained-in-bean-station-ice-raid-filing-
suit-claiming-rights-violations/1799260636.

On April 11, 2018, NILC sent a state-level record request to the Tennessee Department of Safety & Homeland Security.  (Keaney Decl. ¶ 13, Ex. B.)  On May 18, 2018, Tennessee responded by producing documents containing the names of several state officers who participated in the Raid.  However, Tennessee redacted the names of the federal officers in those documents.  (Keaney Decl. ¶ 14 & Ex. C (excerpt of redacted documents)).)  On June 5, 2018, ICE refused to produce any documents, claiming that it was withholding all information based on Exemption 7(A) of the FOIA statute because of ongoing law enforcement investigations.  (Keaney Decl. Ex. D; Decl. of Toni Fuentes, Dkt. 13-2 (the "Fuentes Decl.") ¶ 8.)

**C.     The Officers' Actions Capture The Interest Of Dozens Of Members Of Congress.**

After the Raid garnered significant local and national media attention, 42 members of Congress wrote a letter "condemn[ing]" the Officers' actions at the Raid and demanding answers about how ICE could use an IRS search warrant to justify "the largest workplace raid our nation has seen in nearly a decade."  (Keaney Decl. Ex. E at 1.)  ICE issued a one paragraph reply refusing to answer any questions.  (Keaney Decl. Ex. F.)

While members of Congress sought answers, NILC scoured the internet for names.  A testament to the amount of public interest in the Raid, a NILC employee reviewed more than 100 news articles in an attempt to uncover the names of some of the Officers.  (Keaney Decl. Ex. G ¶ 4.)

**D.     NILC Files The Narrow FOIA Request On December 7, 2018.**

After the first FOIA request and subsequent research yielded little, on December 7, 2018, NILC sent a second, narrower FOIA request to DHS and ICE.  (Keaney Decl. ¶ 16 & Ex. H (previously defined as the "Request")).)  The Request sought only one category of information:

> [T]he identities of all ICE, HSI or other Department of Homeland Security personnel physically present during the above-referenced raid, including, but not limited to:
>
> a)      Full name;
>
> b)      Rank or official title; and
>
> c)      Office location.

(Keaney Decl. Ex. H at 1.)

The Request asked for expedited treatment and a fee waiver, and explained why NILC was entitled to each.  (*Id.* at 2-3.)  Without conducting a search for responsive documents, DHS transferred the Request to ICE.  (Keaney Decl. Ex. I.)  Then, as the government put it in its Memorandum in Opposition to Plaintiff's Motion for a Preliminary Injunction (Dkt. 13, the "First Inj. Opp'n"), there "was an oversight."  (First Inj. Opp'n at 3.)  Somehow, ICE "inadvertently considered" the Request to be a duplicate of the April 2018 FOIA request from NILC.  (Fuentes Decl. ¶ 9.)  ICE considered it a "duplicate copy" of the April 2018 FOIA request even though the April request contained 14 categories of documents and the Request contained one.  (Fuente Decl. ¶ 9; *compare* Keaney Decl. Ex. A, *with id.* Ex. H.)  Compounding its first mistake, ICE "administratively closed the case" and *did not tell anyone*.  (Fuentes Decl. ¶ 9.)

**E.      NILC Files Litigation In Tennessee And Attempts To Seek The Names In Discovery.**

On February 21, 2019, NILC filed a class-action lawsuit in the United States District Court for the Eastern District of Tennessee, Knoxville Division, against nine named employees of Defendants and thirty unnamed Officers (the "Doe Defendants"), Case No. 3:19-cv-00062 (the "Tennessee Litigation").  (Compl. Ex. B.)  Plaintiffs in the Tennessee Litigation (the "Tennessee Plaintiffs") allege individual and class-wide violations of their Fourth and Fifth Amendment rights under the United States Constitution, including conspiracy to violate civil

rights, failure to prevent violation of civil rights, unreasonable search and seizure and excessive force, and seeks compensatory and punitive damages. (*See* Tennessee Plaintiffs' Declarations ¶¶ 1-3; *see also* Compl. Ex. B.)

The Tennessee Plaintiffs tried to seek the information in the Request through discovery in the Tennessee Litigation. The Tennessee Plaintiffs first filed a Motion for Expedited Discovery. (Keaney Decl. Ex. J.) In response, defendant Miles[4] argued that the Tennessee Plaintiffs "should seek information from DHS records from the United States (through its agencies)." (Keaney Decl. Ex. K at 5.) While the Tennessee Plaintiffs continue to believe that the defendants there can and should provide the narrow discovery requested, they have also sought leave to serve a subpoena on DHS to get the information needed to name the Doe Defendants. (Keaney Decl. Ex. L.) Defendants in the Tennessee Litigation so far have refused to produce the information. (Keaney Decl. ¶ 15.) A hearing was held on the Tennessee Plaintiffs' Motion for Expedited Discovery on April 1, 2019. (Keaney Decl. ¶ 17.) At that hearing, the Assistant United States Attorney told the Tennessee court that one document did not exist with the names of the Officers, which is directly contradicted by the document Defendants' produced today. More importantly, the attorney stated that the government *was not seeking to include the names of the Officers in their motion for a protective order.* (Keaney Decl. ¶ 18.)

Earlier today, the Tennessee court issued a Memorandum and Order that purported to grant, in part, Tennessee Plaintiffs' Motion for Expedited Discovery. (Keaney Decl. Ex. Q at 1.) But, critically, it left the possibility of irreparable harm the Court found here. The Tennessee court found that the Tennessee Plaintiffs had established "good cause" to seek

---

[4]   Defendant Miles is the only Tennessee defendant to enter an appearance. (Keaney Decl. ¶ 20.)

expedited discovery.  (Keaney Decl. ¶ 19 & Ex. Q at 7, 10.)  However, because "it d[id] not appear that Defendant Miles has personal knowledge to respond to the interrogatories," the Court found the "best course of action" to be for the Tennessee Plaintiffs to seek the information through its subpoena to DHS.  (Keaney Decl. Ex. Q at 8-9.)  The Tennessee court likewise found "good cause" to grant leave to issue an expedited subpoena.  (*Id.* at 9.)  But while the Court "[wa]s not unsympathetic to Plaintiffs' dilemma," because DHS was a third party, the Court found that it "would be inconsistent with [Federal] Rule [of Civil Procedure] 45(d)(1)" to grant the Tennessee Plaintiffs' request that DHS to respond the subpoena within two days.  (*Id.*)

**F.      After Defendants Refuse To Produce The Information In The Tennessee Litigation, NILC Files This Action.**

Having tried everything to avoid putting a burden on this Court, Defendants' actions forced NILC's hand.  On March 26, 2019, NILC filed the Complaint for Injunctive Relief here and simultaneously filed both a Motion for Expedited Proceedings and a Motion for Preliminary Injunction.  (Dkts. 1, 4-5.)  In addition to the allegations in the Complaint, NILC's motions were supported by a sworn fact and transmittal declaration from Nora A. Preciado, one of NILC's Senior Staff Attorneys.  (Dkt. 5-1.)

Two days after NILC filed this litigation – and more than three months after the Request was sent – ICE acknowledged receipt of the Request.  (Keaney Decl. Ex. M.)  In the March 28 letter, ICE granted NILC's request for expedited treatment and granted NILC's request for a fee waiver.  (*Id.* at 1-2.)  As codified in the federal regulations and impliedly conceded in ICE's letter, ICE made the determination that the public interest in the narrow scope of information NILC requested (the names, ranks and officer locations of the Officers) outweighed any commercial interest NILC had in the information, and that information would lead to a "'significant'" "contribution to public understanding of government operations or activities."

(*Id.* at 2); 6 C.F.R. § 5.11(k).  There was no hint from ICE in its letter that ICE considered the information sought in the Request to be subject to withholding under any FOIA exemption.

The next day, Defendants filed their First Injunction Opposition.  (Dkt. 13.)  In the First Injunction Opposition, Defendants claimed *for the first time* here that the "key information Plaintiff seeks in its FOIA request—names of [the Officers]—would likely be withheld as exempt from disclosure under at least two provisions of FOIA, Exemption 6 and Exemption 7(C)."  (First Inj. Opp'n at 5.)  Defendants had no basis to make that assumption because they had never seen the documents (Hr'g Tr. 9:3-24, April 1, 2019), so these arguments were merely hypotheticals.  Moreover, this Court's local rules do not contemplate reply briefs for injunction motions, so NILC was unable to address this new argument in any papers.  (*See* LCvR 65.1(c).)  Nevertheless, it was clear that Defendants already would continue to further delay providing the narrow information NILC sought more than three months ago in the Request.

## G.     The Court Orders Defendants To Produce Documents Containing The Information NILC Seeks; Defendants Redact It.

On April 1, 2019, this Court held a hearing on NILC's first Motion for Preliminary Injunction.  The Court found that NILC's arguments on irreparable harm were "very, very strong" (Hr'g Tr. 13:5, April 1, 2019) and that, "[b]ut for the government's error," processing of the Request "would have been completed long ago" (Minute Order).  The Court also found that NILC had demonstrated a "substantial likelihood of success on the merits," and required balance of the equities, and stated that the public interest favored granting the injunction because the government already determined that expedited processing was appropriate to fix "the government's error."  (*Id.*)  The Court noted that, unless the requested information was produced prior to the April 5, 2019 deadline, "the individuals Plaintiff represents in Tennessee may lose

their ability to pursue *Bivens* claims due to the imminent lapsing of the relevant statute of limitations." (*Id.*)

As a result, the Court ordered production by close of business today of "at least one record containing all of the information sought by Plaintiff's FOIA request at issue here." (*Id.*)

At 4:35 p.m. today, Defendants produced one ten-page document and a two-page response letter. (Keaney Decl. Ex. P.) Defendants' counsel represented to NILC's counsel by phone earlier in the afternoon that the names and ranks of the Officers are contained in the document, but that they are being withheld under Exemptions 6 and 7(C) to FOIA. This is generally supported by the document itself, though some redactions do not contain any exemption notation and others appear to simply list Exemption 7 without any subpart. (*See, e.g.*, Keaney Decl. Ex. P at 2-5.) Defendants' counsel represented to NILC's counsel that no document contained the Officers' office locations.

Less than an hour later, the Tennessee court issued an opinion that found "good cause" for expedited discovery and granted leave for the Tennessee Plaintiffs to issue an expedited subpoena to DHS. (Keaney Decl. Ex. Q at 7, 10.) However, as a result of the Tennessee defendant's lack of knowledge, the other defendants' failure to appear and the restrictions imposed by Rule 45(d)(1), and despite establishing "good cause" for the information it seeks in Tennessee, this motion is likely the last chance for NILC and the Tennessee Plaintiffs to get the names and ranks of the Officers before April 5, 2019.

This expedited renewed motion for preliminary injunction followed.

**ARGUMENT**

I.  **INJUNCTION IS THE "STANDARD REMEDY" HERE AND THE SAME THREAT OF IRREPARABLE HARM PERSISTS.**

The "standard remedy" for a violation of FOIA is injunctive relief.  *See Middle E. Forum v. U.S. Dep't of Treasury*, 317 F. Supp. 3d 257, 265 (D.D.C. 2018).  In considering a request for preliminary injunction, the Court should assess four factors:  (1) the likelihood of success on the merits, (2) whether the plaintiff will suffer irreparable injury if the injunction is not granted, (3) whether an injunction would substantially injure other interested parties, and (4) whether the public interest would be furthered by the injunction. *See Wash. Post v. Dep't of Homeland Sec.*, 459 F. Supp. 2d 61, 67 (D.D.C. 2006).

Yesterday, the Court found that NILC had "met the standard for preliminary relief (e.g., substantial likelihood of success on the merits, irreparable harm, balance of the equities, and public interest)."  (Minute Order.)  Nothing has changed except the discrete legal issue before the Court.  Instead of deciding whether NILC is entitled to documents at all, this Court is simply analyzing whether Defendants are permitted under FOIA to redact the names of the Officers – depriving NILC of the "key information" it seeks to preserve its clients' *Bivens* claims.  (*See* First Inj. Opp'n at 5.)  Everything else remains the same:  the irreparable harm is still present and "very, very strong" (Hr'g Tr. 13:5, April 1, 2019) because "the individuals Plaintiff represents in Tennessee may lose their ability to pursue *Bivens* claims" (Minute Order) if the information sought in the Request is not unredacted immediately.

The Court should grant the injunction and order the immediate unredaction of the information sought in the Request because NILC has demonstrated that a reasonable person would believe that Officer misconduct might have occurred.  With this motion, NILC has filed

seven sworn declarations, one from each of the named Tennessee Plaintiffs.[5]  Each provides specific details of the Raid and Officer misconduct, and each corroborates the accounts of the others. Moreover, the government has already conceded that it is not seeking to include the names of the Officers in any protective order concerning the production of those names in the Tennessee Litigation.  (Keaney Decl. ¶ 18.)  If nothing else, this proves that Defendants' actions in both fora are nothing more than a stall tactic.

## II.   THE OFFICERS' NAMES ARE NOT EXEMPT FROM DISCLOSURE UNDER FOIA BECAUSE NILC PROVIDED SUFFICIENT EVIDENCE THAT WRONGDOING MIGHT HAVE OCCURRED.

Under the FOIA statute, 5 U.S.C. § 552, Defendants "shall make the records promptly available to any person" who makes a request for records in accordance with the statute and "reasonably describes such records."  5 U.S.C. § 552(a)(3)(A).  ICE has conceded that NILC's record request is proper – indeed, it has expedited the request and granted NILC a fee waiver.  (Keaney Decl. Ex. M at 1-2.)

As a result, in order to deny NILC the limited information it seeks in the Request, the information requested must fall under one of the nine narrow exemptions articulated in Section (b) of the FOIA statute.  *See* 5 U.S.C. § 552(b)(1)-(9).  Here, Defendants claim that they can redact the names of the Officers – the "key information" in the Request – under Exemptions 6 and 7(C).  (First Inj. Opp'n at 5; Keaney Decl. Ex. P.)

---

[5]   Local Rule 11.2, among others, states that "[w]henever any matter is required or permitted by law or by rule to be supported by the sworn written statement of a person …, the matter may, with the same force and effect, be supported by the unsworn declaration … in writing of such person which is subscribed as true under penalty of perjury, and dated, in substantially the following form: … 'I declare under penalty of perjury that the foregoing is true and correct. Executed on (date).  (Signature)'."

Exemption 6 protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Exemption 7(C) protects "records of information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information … could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C).

Even assuming Exemption 7(C) applies here, the Court should still order the unredaction of the information.[6] When examining the propriety of a redaction under Exemption 7(C), the Court first "determine[s] if there is a privacy interest in the information to be disclosed." *100Reporters LLC v. U.S. Dep't of Justice*, 316 F. Supp. 3d 124, 159 (D.D.C. 2018). If a valid privacy interest exists and there is a public interest in the disclosure of the information, the Court "must balance that privacy interest against the public interest in disclosing the information." *Id.* The public interest must be significant and "sufficient to outweigh the privacy interest." *Id.*

In *National Archives & Records Administration v. Favish*, the Supreme Court of the United States held that:

> [W]here there is a privacy interest protected by Exemption 7(C) and the public interest being asserted is to show that responsible officials acted negligently or

---

[6] If Exemption 7(C) applies, analysis need only proceed under Section 7(C) because "'Exemption 7(C) is more protective of privacy than Exemption 6' and thus establishes a lower bar for withholding material." *100Reporters LLC v. U.S. Dep't of Justice*, 316 F. Supp. 3d 124, 159 (D.D.C. 2018) (quoting *Prison Legal News v. Samuels*, 787 F.3d 1142, 1146 n.5 (D.C. Cir. 2015)). For this reason, even if the Court were to find that Exemption 6 applied and Exemption 7(C) did not, the outcome would be the same for the reasons stated in this motion – the information should be immediately unredacted. *See Stern v. F.B.I.*, 737 F.2d 84, 91 (D.C. Cir. 1984) ("Because Exemption 7(C) places a greater emphasis on protecting personal privacy than does Exemption 6, it is clear that Exemption 6 also is no bar to disclosure of the [wrongdoer's] identity.").

otherwise improperly in the performance of their duties, the requester must establish more than a bare suspicion in order to obtain disclosure. Rather, the requestor must produce evidence that would warrant a belief by a reasonable person that the alleged Government impropriety ***might*** have occurred.

541 U.S. 157, 174 (2004) (emphasis added).

The Fourth Circuit, which requires the same type of balancing test as this Court, has ordered the unredaction of ICE officer names in strikingly similar circumstances. In *Casa de Maryland v. United States Department of Homeland Security*, the Fourth Circuit affirmed the Maryland District Court's order requiring the production of the names and its finding that the plaintiff had "c[o]me forward with sufficient facts to suggest that government impropriety occurred and that the public interest in such information outweighed the privacy interests asserted by ICE." 409 F. App'x at 697, 699 (4th Cir. 2011) (per curiam) ("*Casa*"). In *Casa*, ICE arrested 24-Latino day laborers suspected of being in unlawful immigration status during a raid outside of a Baltimore-area 7-Eleven convenience store. *Id.* at 698. Non-Latino day laborers were also on the premises, but agents neither questioned nor detained them. *Id.* Following the raid, CASA de Maryland, a Latino community advocacy group, sent ICE a formal FOIA request seeking records relating to the arrests or the investigation of that incident. Relying on Exemptions 6 and 7(C), ICE redacted from the report the names and initials of individuals, including ICE agents and deportation officers, involved in the raid. *Id.* at 698-99.

Defendants argued that the officers on the ground during the 7-Eleven raid had a privacy interest in keeping their names redacted because "'[d]isclosure of such information would lead to their identification'" and "'could subject these individuals to unwanted contact by the media and others, and/or expose them to unreasonable annoyance, harassment, or threats of reprisal.'" *Id.* at 699 (alteration in original) (citation omitted). ICE argued that privacy interests of the individual agents and officers far outweighed the public interest in disclosure because

18

"revealing the 'personnel names and other identifying information would not shed light on how ICE carries out its statutory duties.'" *Id.* (citation omitted).  CASA filed suit under FOIA asking the district court to order disclosure of any documents, records, and information related to the raid that it had previously requested from ICE.  *Id.*  Particularly, CASA sought disclosure of unredacted reports.  *Id.*

In affirming the District Court, the Fourth Circuit concurred that ICE identified a legitimate privacy interest in the "non-disclosure of their identities and their connection with particular investigations because of the potential for future harassment, annoyance or embarrassment." *Id.* at 700 (quoting *Neely v. F.B.I.*, 208 F.3d 461, 464-65 (4th Cir. 2000)). However, using the standard articulated in *Favish*, the Fourth Circuit agreed with the District Court that plaintiff had put forth sufficient evidence to "'warrant a belief by a reasonable person that the alleged Government impropriety might have occurred.'" *Id.* (quoting *Favish*, 541 U.S. at 174).  In *Casa*, the evidence of impropriety included "affidavits from thirteen of the arrestees which all suggested that government agents arrested them without first obtaining any information about their immigration status and ignored the non-Latino day laborers." *Id.* at 700-01.  Based largely on that evidence, the Fourth Circuit agreed that the names should be produced.  *Id.* at 701.

Here, as in *Casa*, NILC has provided sworn statements from multiple people – representing a class of workers subjected to the Raid – who were wrongfully arrested without ICE agents first obtaining any information about their immigration status.  (*See* Zelaya Decl. ¶ 15; Guerrero Decl ¶ 15; Romulo Decl. ¶ 11; Bautista Decl. ¶ 20; Pulido Decl. ¶ 6.)  Similarly, as in *Casa*, NILC has provided sworn statements from multiple people stating that white workers were ignored.  (*See* Guerrero Decl ¶ 10; Bautista Decl. ¶ 14; Pulido Decl. ¶ 11.)  Moreover, the

corroborative accounts in the seven sworn declarations provided by each of the named Tennessee

Plaintiffs detail a much more extreme situation than simply approaching Latino day-laborers

outside of a 7-Eleven.  Under the cover of an IRS search warrant for financial documents that

was executed weeks after the strike plan was put into place, at 9:00 a.m. on the morning of April

5, 2018, in a coordinated state and federal effort, and with transport vans waiting and air support,

dozens of Officers swarmed the Plant.  (*See* Facts § A, *supra*.)  Multiple officers blocked the

exits to the Plant, and vehicles blocked the one road leading into the Plant.  (*Id.*)  The Officers

pointed their guns at the unsuspecting Latino Plant workers, forced them outside the Plant, zip-

tied them, ordered them not to move or utter a word, and then transported them to a waiting

holding center in an entirely different town.  (*Id.*)  One of the declarants was punched in the face

without provocation; another had a gun held to his head and was forced to relieve himself in

front of other Officers (who did nothing to stop this cruelty).  (*Id.*)  The Latino Plant workers

were detained for several hours, and many were detained more than ten hours.  (*Id.*)  Ultimately,

almost 90% of those arrested were not charged with any crime, and not a single worker was

charged with a violent crime.  (*Id.*)[7]

Other cases support NILC's position as well.  For example, in a recent District of

Arizona case, Plaintiffs sought to compel DHS to unredact names of employees "accused of

mistreating unaccompanied children . . . in DHS custody."  *Am. Civil Liberties Union of Ariz. v.*

*U.S. Dep't of Homeland Sec. Office for Civil Rights & Civil Liberties*, No. CV-15-00247-PHX-

---

[7]   By contrast, in each of the three cases identified by Defendants in the First Injunction
Opposition, the District Court noted that "there is no allegation of illegal activity by the
agency."  *Parker v. U.S. Immigration & Customs Enf't*, 238 F. Supp. 3d 89, 99 (D.D.C.
2017); *see also James v. Drug Enf't Admin.*, 657 F. Supp. 2d 202, 208-09 (D.D.C. 2009)
(stating that plaintiff had not "made the showing of official misconduct required to
overcome" Exemption 7(C)); *Long v. Immigration & Customs Emf't*, 279 F. Supp. 3d, 226,
245 (D.D.C. 2017) (no mention of official misconduct in reasons for FOIA request).

JJT, 2018 WL 1428153, at *1 (D. Ariz. March 22, 2018) ("*ACLU*"), *appeal filed*, No. 18-15907

(9th Cir. May 18, 2018).  While the court in *ACLU* found that DHS had identified a "nontrivial

privacy interest," it also found that Plaintiff's requests "implicated a significant public interest—

an agency's performance of its statutory duty."  *Id.* at *3-4.  In balancing the required interests,

the court ordered the names unredacted because it would be "more than marginally useful to

Plaintiffs" because without those names Plaintiffs could not effectuate the purpose of their FOIA

request:  to see if agencies were turning a blind eye to abuse.  *Id.* at *5.  Similarly here, NILC has

implicated a significant public interest because it seeks the names of the Officers to hold those

Officers accountable to the workers and the public for their misconduct.  Moreover, the names

would be much "more than marginally useful to" NILC—as Defendants concede, the names are

the "key information" NILC seeks.  *Id.*  at *5; (First Inj. Opp'n at 5).

      As another example, in *Stern vs. F.B.I.*, the D.C. Circuit, applying the balancing

test in Exemption 7(C), affirmed the production of the name of a federal agent because a federal

agent had "participated *knowingly*" in misconduct.  737 F.2d 84, 93 (D.C. Cir. 1984).  The

Circuit Court held that "[t]he public has a great interest in being enlightened about …

malfeasance by this senior FBI official" and "[t]he excuse that the [agent] was merely following

orders should not prevent the public from being informed that a specific 'senior bureau official'

followed a deliberately-chosen course when placed, perhaps, between a hard rock and his

conscience."  *Id.* at 94.  The Circuit Court stated that "[o]ne basic general assumption of the

FOIA is that, in many important public matters, it is for the public to know and then to judge."

*Id.*[8]  Likewise here, the public has great interest in being enlightened about the full scope of the

---

[8]    In *Stern*, the Circuit Court, noting that it was a "close" call, ordered that the names of two
    employees who "inadvertently" participated in the wrongdoing should not be disclosed.  737

*(cont'd)*

actions of the Officers that day and knowing that individuals can seek redress if their

Constitutional rights are violated.

In short, NILC has provided more than sufficient evidence to show that

wrongdoing may have occurred and that the names should be unredacted.  There is a significant

public interest in understanding when federal officers violate the law, and there is significant

public interest in allowing the workers subjected to the Raid to hold the Officers accountable for

their actions and not giving the Officers a technical argument to avoid the workers' claims.[9]  *See*

*Casa*, 409 F. App'x at 700-01; *ACLU*, 2018 WL 1428153, at *5; *Stern*, 737 F.2d at 94.

Moreover, there is no burden here—it should take no more than an hour to unredact the names.

Defendants know exactly what needs to be unredacted.  "The basic purpose of FOIA is to ensure

an informed citizenry, vital to the functioning of a democratic society, needed to check against

corruption and to hold the governors accountable to the governed."  *Bartko v. Dep't of Justice*,

79 F. Supp. 3d 167, 171 (D.D.C. 2015) (quoting *John Doe Agency v. John Doe Corp.*, 493 U.S.

146, 152 (1989)).  The public interest favors unredacting the information sought in the Request.

And the government itself seems completely fine with publicly producing the names in the

Tennessee Litigation, it is simply refusing to do it before the potential April 5, 2018 deadline.

(Keaney Decl. ¶¶ 18-19.)

_____

*(cont'd from previous page)*

F.2d at 93.  There is nothing inadvertent about the facts alleged in the seven declarations
here.

[9]   As noted in prior briefing, NILC believes that any statute of limitations argument by the
current "Doe Defendants" in the Tennessee Litigation should fail as a matter of law.

## CONCLUSION

For the foregoing reasons, NILC respectfully asks this Court to enjoin Defendants and to order them to unredact all information sought by the Request in the documents produced on April 2, 2019 within two hours of the conclusion of the Court's ruling at any hearing or on the papers.

Dated:  April 2, 2019

Respectfully submitted,

/s/  Donald P. Salzman
Donald P. Salzman, DC Bar No.  479775
1440 New York Avenue, N.W.
Washington, D.C.  20005
T: 202-371-7983
F: 202-661-9063
E: Donald.Salzman@probonolaw.com

Eben P. Colby, MA Bar No. 651546,
Admitted Pro Hac Vice
500 Boylston Street
Boston, Massachusetts 02116
T: 617-573- 4855
F: 617-305-4855
E: Eben.colby@probonolaw.com

Arthur R. Bookout, DE Bar No. 5409,
Admitted Pro Hac Vice
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
T: 302-651-3026
F: 302-434-3026
E: Art.bookout@probonolaw.com

Jason S. Levin, DE Bar No. 6434,
Admitted Pro Hac Vice
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
T: 302-651-3086
F: 302-434-3085
E: Jason.levin@probonolaw.com

*Counsel for National Immigration Law Center*